applied to another, and that the use of the moneys raised by taxation for "county contingencies" to the payment and discharge of claims against the corporation, or for city contingencies, cannot be sustained. If the city have such charges and liablities to meet, such an item must be provided for in the annual tax bill, and because there are such liabilities which must be met, it is no reason, to my mind, why moneys which the legislatnre have authorized to be raised for one object, and which they have solemnly declared shall not be used for any other, shall be thus misapplied, and the obligations, to discharge which the fund was raised, remain unpaid.

I am unable to perceive any serious embarrassment which will result from an adherence to these requirements of the law. Whether there may be or not, I am not at liberty to disregard them, and being satisfied that the relator is entitled to the relief asked for, the motion for the peremptory mandamus is granted, with costs.

[New York Special Term, December 20, 1856. *Davies*, Justice.]

———o-o-o———

The People, *ex rel.* McSpedon & Baker, *vs.* Andrew V. Stout, county treasurer.

The Same, *ex rel.* McGill, *vs.* The Same.

The necessary expenses incurred in keeping the property of a county in repair, and to preserve it from décay, and keep it in a condition for use, is a proper and legal county charge.

And it being the duty of the supervisors to provide rooms suitable and sufficient for the transaction of the business of the courts, they have the authority to keep such rooms in order. Hence expenses incurred for cleaning and painting, and other needful reparations of the court rooms, are a proper and legal county charge.

And the amount thus expended, having been audited and allowed by the board of supervisors, such audit and allowance is final and conclusive, as to the amount.

But, in the city and county of New York, the board of supervisors are restrained by statute from entering into any contract for work to be done, or supplies

The People *v.* Stout.

furnished, for the corporation, involving an expenditure of more than $250, except by contract founded on sealed bids, or on proposals, made in compliance with a public notice of ten days, which contracts shall be given to the lowest bidder with adequate security. Therefore, where work amounting to over $250, is done, without any public notice being given, for bids or sealed proposals, and without any bids or proposals having been received, or any contract being executed, and the accounts for such work are audited and allowed by the board of supervisors, their act in auditing and allowing them is a mere nullity, and it is the duty of the county treasurer not to pay the accounts; and a mandamus compelling him to pay them will not be granted.

The act of April 12, 1853, amending the charter of the city of New York, so far at least as it seeks to make applicable to the board of supervisors sections 12 and 15 of that act, was as passed, unconstitutional and void, for the reason that the power was delegated to the people of the city of New York to say whether or not it should be a law of the state.

But by the 4th section of the act of June 14, 1853, supplementary to the act of April 12, 1853, which section declares that the supplementary act, and the acts to which it is supplementary " shall commence and take effect as laws immediately," the legislature expressed its will that the act of April 12 should immediately become, and take effect as, a law. And the act of April 12 was re-enacted by the act of June 14; and the constitutional objection to the former, on the ground that it was dependent upon the will of the electors whether or not it should become a law, was therefore obviated.

AN alternative mandamus having been previously issued in each of the above cases, a motion was now made that a peremptory mandamus issue. In the first case it was alleged that on the 25th of January, 1855, a resolution was adopted by the board of supervisors of the city and county of New York directing the books of record in the register's office to be repaired under the direction of the committee of the board on county officers. That the relators were employed to do the said work, and performed the same, and that their bill therefor was duly presented to the board of supervisors, and audited and allowed at the sum of $2644.50. That the board of supervisors directed the defendant to pay the same. In the second case the relator alleged that he was employed by three of the supervisors, constituting the committee on civil courts of the board of supervisors, to paint the rooms occupied by the superior court; that he so painted them, and presented his bill to the board of supervisors for said work, amounting to the sum of $300, which

The People *v.* Stout.

bill said board audited and allowed at that sum, and directed the defendant to pay the same.

*J. W. Edmonds*, for the relators.

*M. V. B. Wilcoxson*, for the defendant.

Davies, J.   The register of the city and county of New York is a county officer, (§§ 1 *and* 2 *of Art.* 10, *Const.* 1846, *art.* 8, *title* 2 *of chap.* 12, *part* 1 *of R. S.*)   It is made the duty of the register of the city and county of New York to provide the necessary books for recording deeds and mortgages, and books for general indices.   A like duty is imposed on the clerks of the several counties.   In the case of *Bright* v. *Supervisors of Chenango*, (18 *John.* 242,) this court held that "the books directed to be procured become permanent records, and are the property of the county.   Although not exclusively, they are chiefly, for the benefit of the county.   The clerk is bound to transmit them to his successor.   The successor is not bound to pay the preceding clerk, and hence it follows that if no compensation is to be made, it becomes a game of chance between the different incumbents.   The one who comes in after books are provided, and retires before new ones are necessary, will find it an office of profit, while the predecessor who purchased the books, and is shortly thereafter removed, may not have realized sufficient to equal his actual advancements.   Such injustice has not received the sanction of law, but is guarded against by requiring the supervisors " to allow all accounts chargeable against the county."   The authority was general, and was intended to embrace any case where the service rendered was specially for the benefit of the county, and for which other provision had not been made.   The present case is clearly one of that description, so far as it respects the books purchased.   In conformity with this principle, the books in the register's office have been purchased and paid for by the county, and consequently are the property of the county.   It follows that the necessary expenses incurred in keeping the property

of the county in repair, and to preserve it from decay, and keep it in a condition for use, is a proper and legal county charge. The audit and allowance by the board of supervisors in cases where they are authorized to act is final and conclusive as to the amount to be paid. (*People* v. *Supervisors of Queens Co.* 1 *Hill,* 195. *Same* v. *Lawrence,* 6 *Hill,* 244.)

By section 28 of the code it is made the duty of the supervisors of the several counties of this state to provide the courts appointed to be held therein with rooms, attendants, fuel, lights and stationery suitable and sufficient for the transaction of their business. If the supervisors neglect, the court may order the sheriff to do so, and the expense incurred by him shall be a county charge. Section 51 of the code makes this section applicable to the superior court, court of common pleas and marine court of this city. If, therefore, the supervisors incur the expense, in compliance with the requirements of the code, such expense necessarily becomes a county charge. If it is incurred by the sheriff in pursuance of the order of the court, the law declares it shall be a county charge. The providing of rooms suitable and sufficient for the transaction of the business of the court, necessarily carries with it the authority to keep the rooms in suitable and convenient order, such as cleaning, painting, or other needful reparations, and if the one is a proper and legal county charge it follows that the other would be also. The amount therefore expended is a proper and legal county charge upon these grounds, and it having been audited and allowed by the board of supervisors, such audit is final and conclusive as to the amount, for the reasons above stated.

If there was no other obstacle in the way, I should grant the peremptory mandamus in each of the above cases, for the reasons stated in the opinion in the case of the people on the relation of *Downing* against this same defendant. But the legislature have thought proper to place restraints upon the action of the board of supervisors of this county, which do not exist in reference to the supervisors of any other county of this state, that I am aware of. At the session of the legislature held on the 12th of April, 1853, an act was passed, further to amend the

The People *v.* Stout.

charter of the city of New York, which made many radical changes in reference to the city government, the management and disposition of its property; and the duties and liabilities of the officers of the city government; the organization of the courts therein, and the powers of the board of supervisors. Section 12 of that proposed act declares that all work to be done and supplies to be furnished for the corporation involving an expenditure of more than two hundred and fifty dollars, shall be by contract, founded on sealed bids, or on proposals, made in compliance with public notice, for the full period of ten days; and all such contracts when given, shall be given to the lowest bidder with adequate security. All such bids or proposals shall be opened by the heads of the departments advertising for them, in the presence of the comptroller and such of the parties making them as may desire to be present. Section 15 of the same proposed act declares " that no contract by the supervisors shall be valid unless expressly authorized by statute, and such as are authorized must be made in the manner provided by the twelfth section of this act."

The contracts in each of the above cases, it is apparent, were such as the supervisors were authorized to make, but it is further declared that such contracts must be made in the manner provided in the twelfth section. It is conceded that they were not so made; that the expenditure in each case was over the sum of $250; that no public notice was given at all for bids or sealed proposals; that none were received; and that the work was not done by contract. If this statute be the law of the state, it follows that the supervisors could create no legal liability against the county by having this work done, in direct violation of the provisions of this act; that no charge has been created against the county, and that this court not only should not award a peremptory mandamus to the county treasurer commanding him to pay these accounts, but that it would be its duty, on a proper application, to restrain him from so doing. Neither the corporation nor the board of supervisors can be bound or charged with a contract made contrary to law. The cases on this subject are too numerous and familiar to need citation. Neither can the

corporation or the board of supervisors assume and pay a debt not a legal obligation upon them. (*Hodges* v. *City of Buffalo*, 2 *Denio*, 110. *Halstead* v. *Mayor of New York*, 3 *Comst.* 430.) Neither will a mandamus be awarded to compel the county treasurer to pay an account audited and allowed by the board of supervisors which was not a legal county charge. (*People* v. *Lawrence*, 6 *Hill*, 244.) In this case the supervisors of the county of New York audited and allowed to the relator, Justice Merritt, his account for expenses incurred by him in defending himself as one of the special justices in the city of New York, on an impeachment and trial before the county court. The county treasurer refused to pay the account thus audited and allowed, and an application was made to this court for a mandamus to compel him. Bronson, J., in delivering the opinion of the court, says: "Whatever appearance of justice there may be in charging the expenses of the account upon the county, it is enough for us to say, that this consideration addresses itself exclusively to the legislature. If this had been a case where the supervisors had authority to allow the claim, I agree that it would have been the duty of the treasurer to pay, without inquiring whether the account had been allowed upon insufficient evidence or at too large an amount. But as the supervisors had no jurisdiction over the subject matter, and that fact appeared upon the face of the account presented for payment, their act was a mere nullity, and it was the duty of the treasurer to withhold payment."

So in the cases under consideration, it appears from the papers that the work was not done in the manner prescribed in the 12th and 15th sections of the amended charters of 1853, and the act of the supervisors in auditing and allowing the accounts was a mere nullity, and it was the duty of the treasurer not to pay them. This is on the assumption that the act of 1853 is a valid and constitutional law. I am aware that the application of these principles seems harsh, but with the hardship of the case I can have nothing to do. The legislature have made the law, and with them rests the responsibility. My duty is to expound and execute it as I find it, and the results flowing

The People *v.* Stout.

from it, in cases like those now before me, may lead the legislature to a careful review of these provisions. These parties, mechanics, have rendered services and performed labor for the corporation and the county, and of which the public authorities have had the benefit, but through oversight or from motives not explained, the agents of these bodies have chosen to have this work done in a manner prohibited by law, and in a way which the law declares shall not be valid. While I may regret that in these particular cases I am compelled to come to this result, my duty to maintain the law as I find it is too clear to shrink from it.

But is the law of 1853, amending the charter, valid and constitutional? This question has been argued at great length, and with the ability and learning which might be expected from the distinguished counsel employed. It is insisted, on the part of the relators, that this act is void, because it was not in fact a law enacted by the legislature; that they delegated to the people of the city of New York, to say whether or not it should be a law of this state, and that such delegation was unconstitutional, for the reason that one portion of the people of the state cannot say what shall be a law for the whole state.

These suggestions are of force, and are not free from serious difficulty. Section 20 of this act provided that the said act should be submitted for the approval of the electors of the city and county of New York, at an election to be held in said city, on the 7th of June in that year; and if a majority of the tickets voted at such election contained an approval of said act, then the same should become a law. If a majority of the tickets voted at said election contained a disapproval of the act, then the said act should be void. Section 1 of article 3 of the constitution of this state declares, that the legislative power of this state shall be vested in a senate and assembly. Section 14 of said article declares, that the enacting clause of all bills shall be, " The people of the state of New York represented in senate and assembly, do enact as follows," and no law shall be enacted except by bill. Section 15 declares, that no bill shall be passed unless by the assent of a majority of the members

elected to each branch of the legislature. It is contended, on the part of the relators, that this submission of the question, whether the act should or should not become a law, is in conflict with the constitution, and that the act is unconstitutional and void.

A similar provision was inserted in the act passed March 20, 1849, in reference to free schools in this state. The 14th section of that act declares, that in case a majority of all the votes cast at the election to be held to vote in relation to the act should be cast against the law, then that act should be null and void, and in case a majority of all the votes should be cast for the law, then that act should become a law. The effect of such provisions in the school law, and of a similar proceeding to the one now under consideration, was passed upon by the court of appeals of this state, in the case of *Barto* v. *Himrod*, (4 *Seld.* 483 ;) Ruggles, C. J. in delivering the opinion of the court says, "It cannot be said that the propositions contained in that law, in relation to free schools, were enacted as law by the legislature. They were not law or to become law until they had received a majority of the votes of the people, at the general election, in their favor, nor unless they received such majority. It results, therefore, unavoidably from the terms of the act itself, that it was the popular vote which made the law. The legislature proposed the plan or project, and submitted it to the people to be passed or rejected. The legislature had no power to make such submission, nor had the people power to bind each other by acting upon it. They voluntarily surrendered that power when they adopted the constitution." Willard, J. says, "The law under consideration is in conflict with the constitution, in various respects. Instead of becoming a law by the action of the organs appointed by the constitution for that purpose, it claims to become a law by the vote of the electors. And it claims that the popular vote may make it void, and restore the former law. All the safeguards which the constitution has provided are broken down, and the members of the legislature are allowed to evade the responsibility which belongs to their office. * * * If

The People *v.* Stout.

this mode of legislation is permitted and becomes general, it will soon bring to a close the whole system of representative government, which has been so justly our pride. The legislature will become an irresponsible cabal, too timid to assume the responsibility of lawgivers, and with just wisdom enough to devise subtle schemes of importance to mislead the people. All the checks against irresponsible legislation will be swept away, and the character of the constitution will be radically changed." This decision is conclusive upon the question as to the unconstitutionality of this act, if it is not distinguishable from the one passed upon in that case.

The counsel for the defendant contends that that act was an act to amend and alter the charter of the city of New York, and that it could not be constitutionally enacted without the assent of the electors of the city was obtained. This very point was passed upon by Allen, J., in the case of *Clark* v. *City of Rochester*, lately decided by him. In 1851 an act was passed by the legislature of this state, to amend the charter of the city of Rochester. (*Laws of* 1851, *ch.* 389.) Section 285 to 290, inclusive, provided for the subscription by the common council of the city of Rochester to the stock of the Rochester and Genesee Valley rail road company. Section 291 provided for submitting to the electors of the city of Rochester, whether those sections should take effect as a law. Section 292 declared, that if two-thirds of the votes cast were in favor of said sections, then the same were to take effect immediately on filing a certificate of such election. Judge Allen says, " The expediency of laws of this character is to be judged of only by the legislature, and they cannot shrink from the constitutional responsibility resting upon them. It is not the case of conferring new powers or additional franchises upon a private corporation, which the corporation may elect to accept or not as they may deem expedient." So in the case now under consideration, the provisions of the act of 1853, now called in question, do not affect any of the franchises or property of the corporation, or confer any new powers or additional franchises upon it. They are but govern-

mental regulations affecting the powers of the supervisors which it was competent for the legislature to make.

I must, therefore, hold, on the authority of these cases, that the act to amend the charter of 1853, so far, at least, as it seeks to make applicable to the board of supervisors, sections 12 and 15 of that act, is unconstitutional and void, if no subsequent legislation has removed the difficulty. The decision of the court of appeals in *Barto* v. *Himrod,* was pronounced in June, 1853, at about the time the election was held in the city of New York to vote upon this statute. This decision, as it is understood, was the main reason for the passage of the act of June 14, 1853, entitled " an act supplementary to an act entitled an act further to amend the charter of the city of New York, passed April 12, 1853." The fourth section of this act declares, that the same and the acts to which it is supplementary, (that is the act of April 12, 1853,) " shall commence and take effect, as laws, immediately." The counsel for the defendant contends that this was a re-passage of the act of April 12, 1853, and that thereby the legislature expressed its will that that act should immediately become a law. In this position, I am inclined to think he is correct. Regarding the cotemporaneous decision of the court of appeals, I cannot doubt that the legislature must have been aware that the act of April 12 was unconstitutional and void, and that they therefore and thereby re-enacted the same. It is to be observed that the act of June 14, 1853, is not entitled an act to amend the act of April 12, but as supplementary to it.

The great object of the rules and maxims for the interpretation of statutes is, in all cases if possible, to discover the true intention of the law; for this purpose it is necessary to ascertain what was the mind of the framers of a particular statute; and when that can be indubitably ascertained, the duty of the court is to give it effect, whatever may be their own opinion of its wisdom, expediency or policy. (*Smith's Com.* § 515.) I can have no doubt that it was the intention of the legislature to re-enact and declare their will, by section 4 of the act of June 14, that the act of April 12 should immediately become, and take effect as, a law,

and that it is the duty of this court so to regard the language used. Considering the will of the legislature thus declared, we must regard the act of April 12 as in fact enacted by the law of June 14, and the objections to the former in reference to its being dependent upon the will of the electors, whether or not it should become a law, as obviated.

I have not overlooked the objection so forcibly urged by the learned counsel for the relators, that the act of June 14, 1853, was but an amendment of that of April 12, and that an amendment of a void law did not make it valid.   The case of *Bradley* v. *Baxter*, (15 *Barb.* 122,) is certainly an authority for this position, and if the act of June 14 was simply but an amendment of that of April 12, I should hold that it was no ratification of, and gave no vitality to that of April 12.   By a reference to the act amending the school law of March 20, 1849, passed Jan. 31, 1850, (*Laws of* 1850, *chap.* 7,) it will be seen that the latter act only amends the 8th section of the former, and declares that the act of January 31 " shall take effect immediately."   Pratt, J. in delivering the opinion of the court in the case last cited, says, " The legislature in passing the act, (that of March 20, 1849,) with the provision to submit the question to a vote of · the people, assumed that the legislature as well as the people were vested with a power which we hold they do not possess. In amending the act, we have the right to suppose that they still labored under the same impression.   They therefore, *only* intended to amend what they supposed to be a valid law of the land, and not to take the responsibility of re-enacting the law itself.   An amendment made under such circumstances cannot have the effect to make a void law valid."

It seems to me that in this case the legislature did intend to take the responsibility of re-enacting the law itself, and that the language used is more broad and significant than the usual declaration, " that this act shall take effect immediately."   I am, therefore, of the opinion that the provisions of the statute in reference to the duty of the supervisors, to have work done for them done by contract, are valid, and have been legally

enacted, and that consequently the relators have no legal claim against the county for the work thus done contrary to the provisions of law, and the motion for a peremptory mandamus in each case must be denied.

[NEW YORK SPECIAL TERM, December 20, 1856. *Davies*, Justice.]